IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHURCH MUTUAL
INSURANCE COMPANY,

                              Plaintiff,                    OPINION AND ORDER

        v.                                                  19-cv-297-wmc

TRAVELERS CASUALTY
SURETY COMPANY
OF AMERICA,

                        Defendant.

On May 1, 2016, the Cathedral of St. Sava was destroyed by fire.  Insured at the time by plaintiff Church Mutual Insurance Company, the cathedral was subject to an indemnity limit of $12,739,000 for its replacement costs.  Although paid the policy limits, the insured, St. Sava Serbian Orthodox Church ("St. Sava") proceeded to sue Church Mutual for recommending an inadequate replacement cost limit.  Ultimately settling with St. Sava, Church Mutual then brought this lawsuit, seeking reimbursement for its settlement costs from defendant Travelers Casualty and Surety Company of America ("Travelers") under a professional liability policy ("the Travelers Policy" or "the Policy").[1]

Presently before the court are the parties' cross-motions for summary judgment.  Specifically, Church Mutual seeks a declaration as a matter of law that:  the Travelers Policy covers St. Sava's claim; no exclusions apply; and accordingly, Travelers' refusal to

---

[1] Plaintiff's amended complaint alleges that it is incorporated and maintains its principal place of business in Wisconsin. Defendant is incorporated in Minnesota while maintaining its principal place of business in Connecticut, and the amount in controversy exceeds $75,000.  (*See* Am. Compl. (dkt. #23) ¶¶ 1-2, 4.)  Accordingly, this court has diversity jurisdiction under 28 U.S.C. §1332.

reimburse Church Mutual for its settlement costs under the Policy constitutes a bad faith breach of an insurance contract.  (Pl.'s Br. (dkt. #36) 1.)  For its part, Travelers seeks a declaration as a matter of law that it has *no* obligation to provide indemnity coverage for St. Sava's claim under the Policy, both because there was no initial grant of coverage *and* because of an express coverage exclusion.  (Def.'s Br. (dkt. #48) 2.)  At minimum, Travelers seeks summary judgment on Church Mutual's bad faith claim.  (*Id*.)

The threshold question under the parties' cross-motions is whether the Travelers Policy granted coverage to Church Mutual for recommendations of replacement cost limits. Under the terms of the Policy, the parties agree the answer to this question comes down to: (1) whether Church Mutual's valuation of the cathedral's replacement cost was an act of "loss control"; or (2) whether the only licensed insurance agent who was involved in the St. Sava account, Sal Perez, committed a "wrongful act" causing St. Sava's injury by participating in Church Mutual's valuation.  As set forth below, the court concludes that the undisputed facts establish Perez was not a part of the valuation process, but Church Mutual's erroneous valuation of the cathedral's replacement costs was an act of loss control.  While finding an initial grant of coverage, however, the court also concludes that the claim falls under one of the Policy's coverage exclusions for "estimate of probable construction costs."  Having concluded that the claim was excluded from coverage under the Policy, the court need not consider whether Travelers acted in bad faith.  Accordingly, the court will grant summary judgment in favor of Travelers and against Church Mutual.

UNDISPUTED FACTS[2]

A.  **The Travelers Policy**

The Travelers Policy was issued by Travelers ("**Company**") to Church Mutual managers and employees ("**Insureds**") for the policy period of July 1, 2017, to July 1, 2018.  (Schechter Decl., Ex. C (Travelers Policy) (dkt. #50-3).)  Of particular relevance to this case is the Insurance Company Professional Liability Coverage section of the Policy, which provides in relevant part:

> The **Company** will pay, on behalf of the **Insureds**, **Loss** that the **Insureds** become legally obligated to pay on account of any **Claim** first made against such **Insureds**, individually or otherwise, during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

(*Id.* at 25 (emphases in original).)  "***Wrongful Act***" is defined in the Policy as:

> any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, committed or attempted by or on behalf of any **Insured**, in their capacity as such, in performing, rendering, or failing to perform or render **Professional Services**.

(*Id.* at 29 (emphases in original).)  "***Professional Services***" is defined as:

> ***Professional Services*** means the following services:
> 1. **Claim Handling Services**;
> 2. safety inspections;

---

[2] These material and undisputed facts are drawn from the parties' proposed findings and supporting evidence for the purposes of summary judgment, unless otherwise indicated.  In summarizing these facts, the court has also considered the evidence presented in the Third Declaration of Michael Crooks (dkt. #70).  Although filed after both summary judgment motions were under advisement, plaintiff moved to include the declaration in support of its motion for summary judgment and in opposition to defendant's motion on the grounds that it was "newly discovered."  (*See* dkt. #69.)  Since defendant had the opportunity to respond to plaintiff's motion and this evidence, and did not oppose either, (dkt. #71), that motion is granted.

> 3. loss control;
> 4. safety engineering;
> 5. premium financing;
> 6. insurance consulting and insurance risk management not related to the compensated sale of a specific type of Contract of Insurance or investment product;
> 7. actuarial consulting;
> 8. personal injury rehabilitation;
> 9. notary services; or
> 10. 1. through 9. above on behalf of an insurance or reinsurance pool, but only for: (i) a customer or client of such pool, or (ii) an owner or beneficiary of, or an insured under, a **Contract of Insurance** issued by such pool.

(*Id.* at 25 (emphases in original).)

The Policy also contains an endorsement that expressly adds to the scope of professional liability coverage for acts of insurance agents and brokers.  (*Id.* at 42.)  This endorsement provides in relevant part:

> The following replaces section **II. DEFINITIONS, CC. Wrongful Act:**
> **CC.** *Wrongful Act* means:
> 1. any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted by or on behalf of any **Insured**, in their capacity as such, in performing, rendering, or failing to perform or render **Professional Services**; or
> 2. an **Insurance Agents and Brokers Services Act.**

(*Id.* (emphases in original).)  The endorsement defines "**Insurance Agents and Brokers Services Act**" as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted by any Insured, in their capacity as a licensed agent or broker, in the sale, placement, or servicing of a **Contract of Insurance**."  (*Id.* (emphasis in original).)

Finally, the Policy contains the following exclusion:

4

> EXCLUSIONS APPLICABLE TO ALL LOSS
> . . .
> 13. **The Company** will not be liable for **Loss** on account of any **Claim** based upon or arising out of any warranty or guarantee (express or implied) or estimate of probable construction costs.

(*Id.* at 31 (emphases in original).)  Neither the term "loss control" (referred to in the definition of Professional Services above) nor the term "construction costs" (referred to in Exclusion 13 above) are defined in the Policy.

## B. Evidence Relating to Meaning of "Loss Control" and "Construction Costs"[3]

### 1. Loss Control

The Church Mutual website defines "loss control" as "methods taken to reduce the frequency and/or severity of loss."  (Crooks Decl., Ex. 4 (dkt. #29-4).)  Additionally, Church Mutual's marketing brochure titled "Risk Control" provides:

> Our exceptionally knowledgeable risk control consultants offer expertise in identifying exposures related to:
> - Employee safety
> - Liability evaluation
> - Property protection
> - Fire prevention
> - Building Valuation
> - Automobile fleet practices
>
> . . .
> Establishing replacement cost values helps you select the right level of building coverage.  We take the time to measure, analyze and evaluate your facilities before recommending building replacement cost value.  As a result, you'll have the information you need to help ensure you are covered in case of a loss.

---

[3] Of course, evidence of the meaning of these terms is only relevant to the extent that common ordinary meanings are ambiguous as used in the Policy itself.  Nevertheless, since offered by the parties, this extraneous evidence as to the meaning of these terms is noted.

(Crooks Decl., Ex. 7 (dkt. #30-2).)  Replacement cost valuation at Church Mutual is done by its Risk Control Department, which used to be called the "Loss Control Department." (*Id.*)

Similarly, various publications from Travelers include a heading devoted to "Risk Control", with a subsection regarding "insurance to value assessments" to assist customers in evaluating whether they have sufficient property insurance limits in place to cover potential losses.  (Third Crooks Decl., Ex. A (dkt. #70-1).)  For example, a publication apparently directed at plastics and rubber goods manufacturers provides:

> **Risk Control**
> Travelers has been in the loss prevention business since 1904 with our Risk Control consultants having an average tenure of over 20 years. We have the experience and technical proficiency that can help plastics and rubber goods manufacturers assess and manage their risk. Areas of specialization include:
> **Property protection**
> • Sprinkler system plan reviews to help protect your property.
> • Insurance to Value (ITV) assessments which can help customers evaluate whether they have sufficient property insurance limits in place.

(*Id.* at 7.)

### 2.  Construction Costs

Todd Blachier, who manages Church Mutual's risk control department, testified that he understands "construction costs" to mean the walls of the building, and "replacement cost" to include the construction quality of the building and everything that is encompassed within the building above standard construction, such as stained glass, organs, or fireplaces.  Karen Sundquist, Church Mutual's Underwriting Supervisor, likewise

testified that construction costs include the base building materials, and is only one part of the replacement cost valuation.

### C. Underlying St. Sava Litigation

Sal Perez is a licensed insurance agent.  He was the primary point of contact between Church Mutual and St. Sava.  His general duties included making contact with a prospective insured, gathering information from the prospective insured, and taking photos and measurements of the building to be insured, then entering that information into a computer program to get the value of the building.

As defendant points out, however, there is no evidence in the record indicating that Perez performed any valuation duties with respect to the St. Sava policy.  To the contrary, Perez specifically testified that he *never* prepared a valuation report for the St. Sava account, and he did not have input into the replacement cost value for St. Sava.  (Perez Dep. (dkt. #32-1) 63:17-24, 123:10-124:5.)  As a general matter, Perez explained that a risk control department employee at Church Mutual would perform the valuation report if they conducted the inspection.  (*Id.* at 63:3-5.)

In the case of the Cathedral of St. Sava, Perez further attests that the initial replacement value set for the Church Mutual policy was based on the previous insurance carrier's valuation.  (Def.'s Supp. PFOFs (dkt. #65) ¶ 155a.)  Then, on or about January 2009, Dennis Checksfield, a Church Mutual Risk Control Consultant, who is not a licensed agent or broker, visited the cathedral to perform a risk control survey.  In that survey, Checksfield took measurements of the cathedral to determine the area and perimeter of the building.

After his survey, Checksfield or someone in the Church Mutual office input the information and zip code for the cathedral into software called "Commercial Express" (also known as "CoreLogic"). This software runs calculations based off of the information inputted and the zip code of the building, resulting in a "Valuation Detailed Report" ("VDR"). The software also maintains a record of the cost estimate for a property when the information is first put into the system, then at each subsequent renewal the software would re-calculate that information to bring it current for inflation, deflation, or cost of materials. (Def.'s Supp. PFOFs (dkt. #65) ¶ 90.)

As a result, Church Mutual does not directly re-calculate the amounts in the VDR, but rather relies on the software to generate that number based on information previously entered, which is then utilized by the underwriting department of Church Mutual to provide a current estimated cost of replacement. In 2013, the software generated a VDR for the Cathedral of St. Sava, calculating the estimated replacement cost at that time to be $15,718,941. David Chartier, who is not a licensed agent or broker, was the underwriter at Church Mutual responsible for the St. Sava policy, including setting the insurance limit and preparing "Renewal Offer Forms" ("ROFs") for St. Sava. Accordingly, it was Chartier who took the $15,718,941 figure from the 2013 VDR and applied the 80% co-insurance on the 2013 coverage rider to arrive at the $12,739,000 indemnity limit for the Cathedral of St. Sava. This limit of insurance was in effect from August 4, 2013, through August 4, 2016, and thus was the effective limit at the time of the May 2016 fire.[4]

---

[4] Insurance Agent Perez did attest that his practice was to pass along these ROFs to St. Sava, which listed the building value/limit of liability. Perez explained that his practice was to read each ROF to the insured, then allow for an opportunity to comment.

Specifically, the Declaration page of the Church Mutual policy issued to St. Sava in effect at that time states:

**ITEM 1. DESCRIPTION OF PREMISES AND COVERAGES:**

PREMISES NO:     001          BUILDING NO:   001
CONSTRUCTION:   JOISTED MASONRY
OCCUPANCY:       CHURCH
LOCATION:         15 WEST 25TH STREET
COUNTY:           NEW YORK
CITY/STATE:       NEW YORK, NY

COVERAGE:  BUILDING
LIMIT OF INSURANCE:  $12,739,000
COINSURANCE PERCENT:  80%
COVERED CAUSE OF LOSS:    SPECIAL
VALUATION:  REPLACEMENT COST

(Crooks Decl., Ex. 24 (dkt. #35-3).)

While Church Mutual accepted coverage for the cathedral's loss by fire and paid the full indemnity limit, St. Sava claimed that the actual replacement cost was in excess of $60,000,000, and so on July 30, 2018, it served a complaint on Church Mutual alleging that the limit was "woefully inadequate." (Pl.'s PFOFs (dkt. #57) ¶ 5.) St. Sava's complaint asserted three causes of action for (1) negligence, (2) negligent misrepresentation, and (3) breach of contract. (*Id.* ¶ 21.) In particular, the complaint alleged:

- Sal Perez, an agent for the sale of the Church Mutual policy, dealt with St. Sava to place coverage.

- "[G]iven the special relationship between St. Sava and Church Mutual, Church Mutual was negligent in failing to properly advise St. Sava as to what would be sufficient limits of insurance to ensure that St. Sava could replace the Cathedral in the event of a catastrophic event like the Fire." (Crooks Decl., Ex. 1 (*St. Sava v. Church Mutual* complaint) (dkt. #29-1) 4.)

9

- "Had Church Mutual properly advised St. Sava as to the replacement costs of the Cathedral, St. Sava would have been entitled to additional insurance proceeds in excess of, but no less than, $47,000,000." (*Id.* at 10.)

Travelers accepted the duty to provide Church Mutual's costs of defense with a reservation of rights as to its obligation to cover Church Mutual's ultimate loss. On April 2, 2019, the St. Sava lawsuit was successfully mediated, resulting in a final settlement and dismissal of the claims. Travelers attended this mediation and agreed that the settlement was reasonable.

## OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts and draw all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Where, as here, a court is faced with cross-motions for summary judgment, it must take care to apply the proper standard to each motion. *Esee Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015). Here, the court will begin with defendant's motion, construing the evidence in the light most favorable to plaintiff. Because even under that "sympathetic reading of the record," no finder of fact could reasonably rule in plaintiff's favor, the court need not specifically address plaintiff's motion. *Id.*

## I. Standards for Interpreting Insurance Contracts

Under Wisconsin law, "the construction of language in an insurance policy . . . is a

question of law, appropriately disposed of on a summary judgment motion." *Burgess v. J.C. Penney Life Ins. Co.*, 167 F.3d 1137, 1139 (7th Cir. 1999). "An insurance policy is construed to give effect to the intent of the parties as expressed in the language of the policy." *Folkman v. Quamme*, 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857. Thus, when interpreting the policy, a court may consider "the apparent object or purpose of the insurance, the subject matter of the insurance, the situation of the parties and the circumstances surrounding the making of the contract." *Emps. Health Ins. v. Gen. Cas. Co. of Wisconsin*, 161 Wis. 2d 937, 946, 469 N.W.2d 172, 175 (1991). If the language is ambiguous, it must be construed in favor of coverage. *Mercado v. Mitchell*, 83 Wis. 2d 17, 25, 264 N.W.2d 532 (1978) ("[W]hen ambiguous language appears in an insurance contract, we must construe the ambiguity in favor of the insured and against the insurance company that drafted the ambiguous language.").

Still, where a policy's language is plain and unambiguous, a court must simply apply it as written. *Folkman,* 2003 WI 116, ¶ 13. Moreover, ambiguity does not arise merely because material terms are undefined in the policy. *Welter v. Singer*, 126 Wis. 2d 242, 248, 376 N.W.2d 84 (Ct. App. 1985). Rather, words in a policy are given their common and ordinary meaning. *Sawyer v. W. Bend Mut. Ins. Co.*, 2012 WI App 92, ¶ 11, 343 Wis. 2d 714, 821 N.W.2d 250. Finally, if a word "is susceptible to more than one reasonable meaning, it is considered ambiguous and should be construed in favor of coverage." *Id.* ¶ 15.

An insurer's duty to indemnify is narrower than its duty to defend. *Hoffman, LLC v. Cmty. Living Sols., LLC*, 2011 WI App 19, ¶ 11, 331 Wis. 2d 487, 795 N.W.2d 62. In

particular, "[w]hile the duty to defend arises from allegations contained in the [underlying] complaint, the duty to indemnify must be supported by fully developed facts." *Id; see also Emps. Mut. Cas. Co. v. Horace Mann Ins. Co.*, 2005 WI App 237, ¶ 13, 287 Wis. 2d 418, 707 N.W.2d 280 ("The duty to indemnify ultimately requires a finding of actual coverage."). The parties agree that the coverage issue in the present case concerns Travelers' duty to indemnify, and so a finding of actual coverage is required for Church Mutual to prevail, rather than just examining the "four corners" of St. Sava's complaint.

## II.  Coverage

As modified by the Insurance Agents and Brokers Services Act Endorsement, the Travelers Policy provides coverage for claims made against the insured for any wrongful acts, which is defined in relevant part as any error committed by the insured in performing or failing to perform professional services or an insurance agents and brokers services act. As set forth above, "professional services" is defined to include, *inter alia*, "loss control." Here, Church Mutual argues that St. Sava's claim arose out of its performance of loss control services -- specifically, estimating the cost of replacing the cathedral. Alternatively, Church Mutual argues that the claim arose out of Sal Perez's "wrongful acts" in adopting that estimate as its insurance agent. Both arguments are addressed below.

### A.  Loss Control

Principally, Church Mutual argues that it provided "loss control services" in setting

the replacement cost value of the cathedral.[5]  The Travelers Policy does not define "loss control," although the parties agree that Church Mutual defines loss control as "methods taken to reduce the frequency and/or severity of loss."  (Def.'s Reply to Pl.'s Resp. to PFOFs (dkt. #67) ¶ 109.)  Moreover, Travelers "agrees with Church Mutual's definition."  (Def.'s Reply (dkt. #66) 19 (emphases omitted).)  Finally, that definition appears to comport with the common and ordinary use of the phrase in a variety of insurance contexts.  *See, e.g., Loss Control*, Int'l Risk Management Inst., Inc., https://www.irmi.com/term/insurance-definitions/loss-control (last accessed March 31, 2021) (defining loss control as "a risk management technique that seeks to reduce the possibility that a loss will occur and/or reduce the severity of those that do occur"); *Insurance Loss Control*, Investopedia, https://www.investopedia.com/terms/i/insurance-loss-control.asp (last accessed March 31, 2021) ("loss control is a set risk management practices designed to reduce the likelihood of a claim being made against an insurance policy"); *Loss Control*, Safeopedia, https://www.safeopedia.com/definition/409/loss-control-health-safety-and-environment (last accessed March 31, 2021) ("Loss control is the proactive measures taken to prevent or reduce loss evolving from accident, injury, illness and property damage."); *Loss Control / Risk Management*, Parker Smith & Feek, https://www.psfinc.com/loss-prevention-safety/ (last accessed March 31, 2021) ("the traditional definition of loss control (or 'risk control')

---

[5] Notably, Church Mutual does not argue that the valuation was a professional service related to "insurance consulting" under the Policy.  This is likely because it tried to argue in an earlier, unrelated case that its appraisal of a church was an "insurance consultation service," a position which the District Court for the Eastern District of Pennsylvania rejected.  *See Oxford Presbyterian Church v. Church Mut. Ins. Co.*, No. CIV. A. 90-3613, 1991 WL 22061, at *1-3 (E.D. Pa. Feb. 19, 1991).

[i]s a collection of methods used to identify and correct the fundamental and underlying causes of loss"); *What is LOSS CONTROL?*, The Law Dictionary, https://thelawdictionary.org/loss-control/ (last accessed March 31, 2021) ("To reduce the frequency or severity of losses, human, engineering, and risk management practices are employed as a multi-disciplinary approach."); *Loss Control Services*, SafetyResources, https://www.safetyresources.com/loss-control-services (last accessed March 31, 2021) ("Loss control is a risk management technique that seeks to reduce the possibility that a loss will occur and reduce the severity of those that do occur."); *Guide for Loss Control/Risk Management Evaluations*, Texas Dep't of Ins., https://www.tdi.texas.gov/commercial/lcguide.html#definition (last accessed March 31, 2021) ("Loss control is a risk management technique that seeks to reduce the possibility that a loss will occur and reduce the severity of those that do occur.").

The parties do not agree, however, whether property valuation for purposes of setting a policy coverage limit is itself a "method taken to reduce the frequency and/or severity of loss." According to Travelers, property valuation neither reduces the frequency of losses nor the severity of loss, as a valuation and concomitant insurance limit only benefits an insured *after* the loss. (Def.'s Opp'n (dkt. #56) 7.) As Travelers would characterize the relevant events, the valuation of the St. Sava cathedral was not an act of loss control because "if the St. Sava Policy's limit of liability had been sufficient to cover the reconstruction of the building in its entirety, it would not have prevented the Cathedral from being entirely destroyed or reduced the chances that a fire would occur." (*Id.*) Church Mutual, for its part, argues that its employees worked with St. Sava "to reduce the severity

14

of losses that could occur -- such as loss of millions of dollars due to inadequate policy limits." (Pl.'s Br. (dkt. #36) 19.) Church Mutual's argument is bolstered by the some of the evidence it presented. In particular, material published by both Church Mutual and Travelers show that property valuation is a service frequently offered under the rubric or context of "risk control."[6]

Both parties' arguments are reasonable, and they reveal the ambiguity in the phrase loss control as a form of professional services covered by the Policy. *See Donaldson v. Urb. Land Interests, Inc.*, 211 Wis. 2d 224, 231, 564 N.W.2d 728 (1997) ("words or phrases in an insurance policy are ambiguous if, when read in context, they are susceptible to more than one reasonable interpretation"). Because of this ambiguity, the court must construe the Policy in favor of coverage. *Id.*

Travelers argues that Church Mutual's interpretation would result in coverage for any activity of an insurance company that reduces the financial impact from an insured's loss. Church Mutual's interpretation, Travelers urges, would mean that the mere issuance of insurance coverage to a customer alone would be an act of "loss control," as it would reduce the severity of the customer's financial impact from a loss. However, this argument ignores that coverage only extends to professional services actually provided, so that in a case like this, liability did not arise out of issuance of the policy, but rather out of the insurance company undertaking the additional professional service of estimating

---

[6] Church Mutual represents that it uses the terms "loss control" and "risk control" interchangeably. (Pl.'s Br. (dkt. #36) 10.) Travelers does not object to this definition, and indeed cites to a definition of loss control by the International Risk Management Institute which states that loss control is "[a]lso known as risk control." (Def.'s Br. (dkt. #48) 21.)

replacement costs.  Regardless, it is incumbent on the insurer to make explicit what professional services are covered or, if certain risks of such services are too great to insure, to exclude then expressly as in the case of Exclusion 13, which excludes from coverage any claim arising out of an estimate of probable construction costs.

### B.  Insurance Agents and Brokers Services Act Endorsement

Alternatively, Church Mutual argues that coverage attaches under the Insurance Agents and Brokers Services Act Endorsement to the Travelers Policy.  As noted above, the Policy provides coverage for claims made against the insured for any wrongful acts, while the endorsement expands that definition of "wrongful act" to include certain acts by insurance agents.

According to Church Mutual, its licensed insurance agent, Sal Perez, committed a wrongful act within the meaning of this endorsement, and so provides coverage under the parties' policy.  To make this argument, Church Mutual relies heavily on the allegations in St. Sava's underlying complaint.  As noted above, however, an insurer's duty to indemnify under Wisconsin law requires a finding of *actual* coverage, not on mere allegations in an underlying claim alone.  *Hoffman, LLC*, 2011 WI App 19, ¶ 11; *Emps. Mut. Cas. Co.*, 2005 WI App 237, ¶ 13.  The undisputed facts proffered in the present record show that agent Perez played only a limited role in St. Sava's claim against Church Mutual, which in no way caused a loss *actually* covered by the Travelers Policy.

In particular, Perez testified *and* the undisputed records confirms that he *never* compiled information nor prepared any valuation report for St. Sava's policy much less provided input into the replacement cost value assigned to the cathedral by Church

16

Mutual.  Instead, the undisputed evidence establishes that the original valuation generally and the 2013 updated valuation in particular, was determined by other Church Mutual employees.  In particular, Church Mutual's Risk Control Consultant Checkfield took measurements of the cathedral in 2009 and entered them into its CoreLogic computer program.  That program then saved these inputs and would generate a VDR for the cathedral, which would periodically be brought up-to-date by the same program based on cost variables and inflation, which were then shared with St. Sava as the insured.  Indeed, there is *no* dispute that in 2013, the CoreLogic program generated a VDR for St. Sava's cathedral of $15,718,941.  Chartier then took this estimate and applied the 80% co-insurance to arrive at the $12,739,000 declared limit under the Policy.  Neither Checksfield nor Chartier are licensed agents or brokers, and Church Mutual has produced *no* evidence showing that its licensed agent Perez took *any* part in this valuation process.

While the evidence shows Perez did pass on an ROF that included the estimated replacement cost and limit of liability to St. Sava, this administerial step is not enough to trigger actual coverage for a "wrongful act" under the Travelers Policy, since Chartier, and not Perez, was responsible for preparing the ROF.  Thus, Church Mutual has produced no evidence showing that its agent, Perez, had any responsibility related to the limit of liability in the original valuation on or in subsequent ROFs, other than simply passing them on to St. Sava.  Accordingly, Perez's wrongful acts, if any, were *not* the proximate cause of St. Sava's claim against Church Mutual and cannot be the basis for coverage under the Travelers Policy.

## III. Exclusion

While the court concludes that there was an initial grant of coverage under the Travelers Policy arising out of Church Mutual's loss control services, Exclusion 13 appears to preclude coverage.  As noted above, this exclusion states in relevant part:

> EXCLUSIONS APPLICABLE TO ALL LOSS . . . **The Company** [Travelers] will not be liable for **Loss** on account of any **Claim** based upon or arising out of any warranty or guarantee (express or implied) or estimate of probable construction costs.

(The Travelers Policy (dkt. #50-3) 31 (emphases in original).)

This exclusion is a species of a "common exclusion" in professional liability policies that exempts coverage for any claim "based upon, arising out of, attributable to, directly or indirectly resulting from express warranties or guarantees."   4 Bruner & O'Connor Construction Law § 11:535.  As such, the exclusion is "the embodiment of the concept that professional liability policies insure professionals against the risks of failing to meet a standard of care rather than guaranteeing or warranting a particular result."  *Id.*  This is because, in general, "warranty liability imposes a higher duty than the implied promise to exercise reasonable care required of members of the insured's profession."  *Id.*  Thus, "[t]here is no coverage for the professional's assumption of liability due to giving a warranty or guaranty.  There is, however, coverage if the warranty or guaranty is breached because of a failure to meet the professional's standard of care."  *Id.*

Case law interpreting this particular kind of exclusion is somewhat limited.  *See* 4 Law and Prac. of Ins. Coverage Litig. § 45:45 ("Few courts have considered the scope and effect of the cost estimate exclusion.  There is little relevant case law, presumably because

18

when faced with the apparently clear language of the exclusion, third-party claimants have not seriously attempted to challenge the application of the exclusion."). The lack of relevant case law is evidenced by the parties' reliance on the same two cases to support their relative positions.

In the first of these cases, *Comstock Ins. Co. v. Thomas A. Hanson & Assocs., Inc.*, 77 Md. App. 431, 447, 550 A.2d 731 (1988), an engineering firm sought coverage under its professional liability insurance policy after being adjudged to have erred in determining the design and cost estimate for construction of a motel. The policy at issue contained an exclusion which stated that "[t]his policy does not apply to express warranties or guarantees, estimates of probable construction or cost estimates being exceeded." *Id.* at 437. The Maryland Court of Appeals in *Comstock* held that the exclusion did not preclude liability, explaining:

> At most, we believe, the exclusion would cover mistakes in the preparation of the estimate itself -- errors in estimating the quantity or quality of materials that will be needed, or in applying or estimating component costs, or in arithmetic or other aspects of calculating or constructing the estimate. But if the overrun results from an underlying defect in either design or other basic engineering work, the exclusion would not apply. That kind of negligence is precisely what the policy was intended to cover, even if its effect is a cost overrun.

*Id.* at 448.

The second case relied on by both parties in this suit is *McMahan & Baker, Inc. v. Cont'l Cas. Co.*, 68 Wash. App. 573, 843 P.2d 1133 (1993). In *McMahan*, a structural engineering firm sought coverage under its professional liability insurance for an action brought against it by a third party claiming that the engineer had failed to apply the proper

analytical methods in arriving at a particular damage appraisal amount.  *Id.* at 1136.  Citing

*Comstock*, the Washington State Court of Appeals, concluded that:

> The gravamen of [the third party's] complaint against [the engineering firm] was not that the engineer had made an estimating error in preparing or calculating the cost estimate, for example by specifying improper materials or an improper quantity of materials, or by improperly determining component costs. Rather, the [third party] alleged negligence in failing to apply appropriate engineering methodologies and analyses to determine the true extent of the damage. The claim was in essence one alleging negligence in basic engineering work, precisely what the policy was designed to cover.

*Id.* at 1137.

Unlike *Comstock* and *McMahan*, defendant here argues that "Church Mutual's

negligence was solely in estimating the replacement cost, which resulted in an inadequate

property limit for the Cathedral.  Thus, the challenged conduct involves mistakes in the

preparation of an estimate of probable construction costs, precisely the type of conduct

that *Comstock* and *McMahan* held would be excluded."  (Def.'s Opp'n (dkt. #48) 19.)  On

the other hand, plaintiff contends "an analysis of the allegations set forth in St. Sava's

complaint makes it clear [that] the claim against Church Mutual arises out of the advice

given, or lack thereof, and alleged misrepresentations made by Church Mutual to St. Sava,

not out of any warranty, guarantee or estimate of probable construction costs."  (Pl.'s Br.

(dkt. #36) 24.)  In particular, plaintiff explains that while "St. Sava did contend that the

replacement cost limits were 'woefully inadequate,' . . . its *claim* was that the valuation

advice given was wrong."  (*Id.* (emphasis in original).)

The question is a close one, but again turns on the question of actual, as opposed

to alleged, coverage, or in this case actual exclusion.  *Emps. Mut. Cas. Co.*, 2005 WI App. ¶

13.  Certainly, if St. Sava's allegation that the proper replacement cost of the cathedral was over $60 million were true, then Church Mutual's $12 million estimate would appear to be the product of more than a mere estimating error.  Such a difference implies some gross negligence or recklessness in the methodology of calculating the replacement cost.  However, these inferences are all built on the allegations in the St. Sava complaint, which plaintiff cannot rely on at this stage for reasons previously addressed.  *See Hoffman, LLC*, 2011 WI App 19, ¶ 11 ("While the duty to defend arises from allegations contained in the [underlying] complaint, the duty to indemnify must be supported by fully developed facts.").  Here, plaintiff has proffered no facts that convincingly show its $12 million replacement cost estimate resulted from some underlying professional negligence, nor even to show what the actual replacement cost should have been.  Without this evidence, the court is left to conclude that the claim falls under the exclusion as nothing more than an estimate of probable construction costs.

Plaintiff also argues unpersuasively that the valuation of the cathedral was not an "estimate of probable constructions costs."  According to plaintiff, "construction costs" include only the walls, while "replacement cost" includes additional aspects such as the construction quality and everything that is encompassed within the building above the standard construction.  (Pl.'s Br. (dkt. #36) 11.)  To support this position, they cite only to the testimony from their own employees.  However, this narrow definition is contrary to the common and ordinary meaning of "construction" and "cost."  *See Construction*, Black's Law Dictionary (11th ed. 2019) (defining "construction" as "the act of building by combining or arranging parts or elements; the thing so built"); *Costs*, Black's Law

Dictionary (11th ed. 2019) (defining "costs" as "the amount paid or charged for something"); *Construction Cost*, Dictionary of Architecture and Construction 249 (4th ed., Cyril M. Harris ed., 2006) (defining "construction cost" as "[t]he cost of all the construction portions of a project") available at https://civilenglineering.files.wordpress.com/2014/10/dictionary-of-civil-engineering.pdf. Moreover, considering the overall context of the Policy the court can discern no reason why "construction costs" would be limited to only *certain aspects* of construction.

## IV. Bad Faith

Because the court concludes that plaintiff's claim is not covered under the Policy, plaintiff's bad faith claim must be dismissed under Wisconsin law, since "[t]o show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Anderson v. Cont'l Ins. Co.*, 85 Wis. 2d 675, 271 N.W.2d 368 (1978). Here, by concluding that plaintiff is not entitled to coverage, the court necessarily finds that defendant had a reasonable basis for denying benefits. As reflected above, even if the court had found coverage, here, the question is close enough that no reasonable trier of fact could find Travelers acted in bad faith by accepting its duty to defend while reserving its right to dispute actual coverage.

ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #37) is GRANTED.

2) Plaintiff's motion for summary judgment (dkt. #27) is DENIED.

3) Plaintiff's unopposed motion for leave to file a declaration (dkt. #69) is GRANTED.

4) The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 6th day of April, 2021.


BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge